In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3837

BRUCE G. HOWELL,

*Plaintiff-Appellant,*

*v.*

MOTOROLA, INC., *et al.,*

*Defendants-Appellees.*

No. 09-2796

STEPHEN LINGIS, *et al.,*

*Plaintiffs-Appellants,*

*v.*

RICK DORAZIL, *et al.,*

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 5044—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED OCTOBER 23, 2008 & MAY 27, 2010
DECIDED JANUARY 21, 2011

Before BAUER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* The two cases that we have con-
solidated for decision in this opinion both deal with the
responsibilities of a company with respect to a defined-
contribution pension plan that it offers to its employees.
The company in each instance is Motorola, Inc., and
the disputes concern employees' retirement accounts in
the Motorola 401(k) Savings Plan (the "Plan"). Bruce
Howell was the original plaintiff when this litigation
began in 2003; later, Stephen Lingis, Peter White, and
Donald Smith intervened as plaintiffs. All were em-
ployees of Motorola who participated in the Plan. In
2007, the district court certified a plaintiff class of all
persons for whose individual accounts the Plan pur-
chased or held shares of Motorola common stock, from
May 16, 2000, through May 14, 2001. (The court later
excluded from that class the defendants, Motorola
officers and directors, and persons who signed valid
releases of their claims against Motorola. Since no issue
pertaining to the class certification or definition is before
us, we have no other comment on those points.) The
defendants include not only Motorola itself, but also
the Profit Sharing Committee of Motorola, Inc., and a
number of individual defendants who allegedly served as
fiduciaries for the Plan. We describe the facts in detail
below. It is enough here to say that Motorola entered
into a business transaction that turned out very badly;
the fallout from that transaction caused the price of
Motorola's stock to decline; that decline led to litigation
against Motorola under the securities laws; and finally,

because a Motorola Stock Fund was among the permissible investments for the Plan, this litigation ensued.

Relying on the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.,* known to all as ERISA, the plaintiffs seek relief for three alleged breaches of fiduciary duty committed by the defendants: (1) imprudence, by selecting and continuing to offer the Motorola Stock Fund to Plan participants despite the defendants' knowledge of Motorola's bad business transaction; (2) either negligent or intentional misrepresentation of material information about the bad business transaction or failure to disclose that information to Plan participants; and (3) failure to appoint competent fiduciaries to the committee that ran the Plan, failure to monitor those fiduciaries, and failure to provide adequate information to the fiduciaries themselves. The district court granted summary judgment in favor of all the defendants on all claims, ruling first that no one had breached any duty imposed by ERISA, and second, that all defendants were entitled to rely on the safe harbor established in section 404(c) of the statute, 29 U.S.C. § 1104(c). We conclude that the safe harbor is available for the plaintiffs' disclosure and monitoring theories (the latter two listed above), but not for the imprudence theory. Nevertheless, we also conclude that the Plan fiduciaries did not breach any duty imposed by ERISA through their inclusion of the Motorola Stock Fund as a Plan investment option. We therefore affirm the judgments of the district court.

## I. General Background

### A. Telsim

Motorola is a large telecommunications company. During the boom years of the 1990s, its stock price increased ten-fold, as the company expanded throughout the world. The seeds of the present case were planted when, on April 24, 1999, a Motorola affiliate called the Motorola Credit Corporation ("Credit") signed an agreement to provide financing to a Turkish company, Telsim Mobil Telekomunikasyon Hizmetleri A.S. ("Telsim"), for a project to improve the infrastructure for mobile telephone service in Turkey. Over time, Telsim borrowed more than $1.8 billion from Credit; to secure the debt, it pledged a number of shares then equaling 66% of its stock as collateral. Telsim's promise unfortunately did not turn out to be worth very much. In April 2001, it missed its first repayment deadline, and the next month Credit issued a notice of default. Unbeknownst to Credit or Motorola, around the same time Telsim tripled the number of its outstanding shares, thus diluting Credit's collateral to about 22% of Telsim's shares.

The parties in the cases before us dispute how forthcoming Motorola was about its problems with Telsim in its filings with the Securities and Exchange Commission during this period. Almost a year earlier, on May 16, 2000, Motorola had filed a 10-Q quarterly report with the SEC in which it reported that it had an agreement with Telsim. (That date marks the beginning of the class period defined by the district court.) The May 16 report optimistically estimated the sales potential from the

agreement to be $1.5 billion over three years; it said nothing about the fact that Credit had loaned the lion's share of the funding for the project to Telsim. Motorola said nothing more about Telsim in its SEC filings until a proxy statement filed on March 30, 2001. In that document, Motorola remarked that it had received several large contracts, including one "for Telsim's countrywide network in Turkey." Ten pages later, in an unrelated section, the report explained that Motorola was owed $2.8 billion as the result of financing it had provided for wireless infrastructure. "[A]pproximately $1.7 billion of the $2.8 billion," said the company, "related to one customer in Turkey." The 10-Q that Motorola filed on May 14, 2001, was slightly more direct: it acknowledged that "[a]s of March 31, 2001, approximately $2.0 billion of [Motorola's] $2.9 billion in gross long-term finance receivables related to one customer, Telsim, in Turkey. . . ." The report mentioned Telsim's pledge of 66% of its shares to secure repayment of that debt, and it said vaguely that "Motorola has other creditor remedies." Finally, the 10-Q report disclosed Telsim's failure to make the payment of $728 million that was due on April 30, 2001. (The May 14, 2001, filing date of Motorola's quarterly report marks the end of the district court's class period.)

The only other disclosures that Motorola made between May 16, 2000, and May 14, 2001, did not mention Telsim by name. Instead, they offered generic references to Motorola's practice of vendor financing. For example, Motorola's November 2000 10-Q warned that certain factors could affect the company's financial results;

one factor it listed was "the demand for vendor financing and the Company's ability to provide that financing in order to remain competitive." Defendant Carl Koenemann, Motorola's Chief Financial Officer, discussed potential problems with Telsim with KPMG, Motorola's accounting firm, during this time. He also raised the subject with defendant Christopher Galvin, the Chairman of Motorola's Board and the Chief Executive Officer during the relevant time, and with defendant Robert Growney, a director and Motorola's Chief Operating Officer. The district court noted that the record contains no evidence that any of the other defendants had any knowledge of problems with the Telsim deal.

As we have noted, Motorola's stock price increased significantly throughout the 1990s. On April 24, 1999, shares were trading at a price close to $30. Although the price spiked to about $40 per share by May 1, 2000, it had slipped back to just over $30 per share by May 16, 2000—the day when Motorola filed the 10-Q announcing the planned sales to Telsim (but not mentioning the corresponding financing) and the start date of the class period. Motorola's stock price continued to decline during the class period. The price was steady through the fall, but as of December 31, 2000, it had fallen to $20 per share. On that date, Motorola announced that it had net income for the fiscal year of $2.2 billion.

In January 2001, Motorola gave a Summary Plan Description ("SPD") to all of its employees who were participating in the Plan. That SPD warned participants that there was some risk in investing in the Motorola

Stock Fund. The Plan had explained this risk on two separate occasions during the preceding year in documentation handed out to Plan participants. Moreover, Motorola's March 30, 2001, proxy statement, which we discussed above, reiterated the risk of the Motorola Stock Fund, noting that $1.7 billion of the company's $2.8 billion in gross long-term finance was tied up with "one customer in Turkey." By the time that statement was filed, Motorola stock had dropped to $14.26 per share. A week later, on April 6, 2001, *Bloomberg News* broke the story of the Telsim deal, identifying Telsim as "the customer in Turkey" that owed Motorola billions. Motorola stock sank 23% in one day, going from $14.95 to $11.50 per share. Interestingly, however, it had recovered a bit (to just above $15) by May 14, 2001—the end date of the class period and the day on which Motorola filed the 10-Q with the SEC that discussed the Telsim problems in some detail. Credit issued a notice of default on May 22, 2001. The stock then edged up to $19 a share by the end of July, but it fell back to $15 a share by December 31, when Motorola reported a net loss of $5.5 billion for the year.

## B.  The Motorola 401(k) Savings Plan

The Plan is a defined-contribution plan established pursuant to ERISA section 407, 29 U.S.C. § 1107(d)(3). This means that participants may contribute up to a specified amount to individual accounts; those contributions are often (as here) matched to some degree by the employer. Upon retirement, the participating em-

ployee has whatever the account has accumulated through contributions and earnings. Unlike a defined-benefit plan, it does not assure any fixed level of retirement income. See *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 250 n.1 (2008). In this case, Motorola matched participant contributions up to 3% of the employee's salary, and it paid 50 cents on the dollar for participant contributions beyond that, up to 6% of salary. The Plan is organized under ERISA section 404(c), 29 U.S.C. § 1104(c); this means that the participants (not the Plan fiduciaries) are solely responsible for allocating assets among the various funds supported by the Plan. KPMG periodically audited the Plan to ensure compliance with Plan documents.

During the relevant period, the Plan Administrator was a group called the Profit Sharing Committee (the "Committee"), which was made up of people appointed by Motorola's Board of Directors. The Committee selected the investments that the Plan would offer its participants, monitored those investments, and provided reports to the Board. Defendant Koenemann served on the Committee for the entire class period, as did Paul DeClerck, Rich Engstrom, and Garth Milne (all of whom were at one point defendants in this lawsuit). Gary Tooker, a member of Motorola's Board, chaired the Committee from May 2, 2000, until the end of 2000, at which point Koenemann succeeded him. Steve Earhart, Motorola's Vice President of Finance, served on the Committee from May 8, 2001, until the end of the class period. The Committee monitored the Plan's invest-

ment options and periodically provided reports to Motorola's Board. It ceased to exist on January 1, 2006.

Before July 1, 2000, Plan participants could channel their contributions (and those Motorola made on their behalf) to any or all of four investment options: (1) the Balanced Fund, (2) the Equity Fund, (3) the Short-Term Income Fund, and (4) the Motorola Stock Fund. After that date, the Plan offered nine choices: (1) the Short-Term Bond Fund, (2) the Long-Term Bond Fund, (3) Balanced Fund I, (4) Balanced Fund II, (5) the Large Company Equity Fund, (6) the Mid-Sized Company Equity Fund, (7) the International Equity Fund, (8) the Small Company Fund, and (9) the Motorola Stock Fund. For the entire relevant time, excluding a brief black-out period that ran from May 1 to June 30, 2000, during which participants were not allowed to make changes in their accounts, Plan participants were entitled to transfer funds out of the Motorola Stock Fund on a daily basis. Before May 1, 2000, they had been allowed to make transfers relating to other investment options only on a monthly basis; but after July 1, 2000, they could move their assets from or to any of the funds offered on a daily basis.

This case involves the decision of the Plan and associated defendants to include, as one option for Plan participants, the Motorola Stock Fund. As the name suggests, that is a fund that exclusively holds Motorola common stock. Up until July 1, 2000, participants were not permitted to invest any more than 25% of their Plan assets in the Motorola Stock Fund—essentially they

were forced to diversify. But then the Motorola employees voted to lift that cap and to permit participants to invest up to 100% of their assets in that fund. The Plan's governing documents allowed, but did not require, the Plan to offer the Motorola Stock Fund as one option, and no Plan participant was ever required to invest in that fund.

Many of the communications that the Plan Administrators disseminated to Plan participants rated the Motorola Stock Fund as the highest-risk investment offered in the Plan. These missives noted that the fund was not diversified, that it was volatile and subject to substantial year-to-year fluctuations, that participants were vulnerable to losses from sudden downturns in securities markets, and that other investments offered by the Plan did not share these problems.

## C. Procedural History

Although the procedural history of these cases is complex, most of it is not relevant to the issues on appeal. We therefore mention only a few points that remain important. Howell appealed the district court's decision to grant Motorola's motion to dismiss on the ground that Howell had signed an enforceable release of his claims against Motorola. The case (No. 07-3837) reached us after the district court certified that holding under Federal Rule of Civil Procedure 54(b). After Howell's case was dismissed, Lingis, White, and Smith intervened in the district court. On September 28, 2007 (about a month before the court issued its order under Rule 54(b)),

the court certified the class under Federal Rule of Civil Procedure 23(b)(2), which permits plaintiffs seeking injunctive relief to proceed as a class. We permitted an immediate appeal from that decision, pursuant to Rule 23(f), but events in both the district court and the Supreme Court overtook the appeal. At the district court level, summary judgment motions were filed and under consideration. For its part, the Supreme Court handed down the decision in *LaRue*, which provided new guidance on the legal issues surrounding defined-contribution plans.

On June 17, 2009, the district court granted Motorola's motions for summary judgment, denied the plaintiff class's motion, and closed the case with a judgment in favor of the defendants. That case (No. 09-2796) is here on the class's appeal of the merits of the district court's summary judgment decision. In the meantime, we agreed to accept interlocutory appeals challenging class certification under Rule 23(b)(1) in two related cases decided today, *Spano v. The Boeing Co.* and *Beesley v. International Paper*, Nos. 09-3001 & 09-3018 (7th Cir. Jan. 21, 2011). While the *Spano* cases concern only the class certification issue, they present questions on the underlying merits that are very similar to the issues in the appeal now before us. We set oral argument for all of these cases for May 27, 2010, and carried forward Howell's appeal to that group. Between the *Spano* opinion and this one, we are now resolving all matters that have been presented to us.

## II. Howell Appeal

Although we earlier identified three major issues on the merits that are common to both cases, there is a preliminary question in Howell's case that must be addressed. It relates to the General Release that Howell signed, which reads as follows in pertinent part:

> I hereby unconditionally and irrevocably release, waive and forever discharge Motorola, Inc. and its affiliates, parents, successors, subsidiaries, directors, officers, and employees, from ANY and ALL causes of action, claims and damages, including attorneys fees, whether known or unknown, foreseen or unforeseen, presently asserted or otherwise, which have or could have arisen to date out of my employment or separation from employment. This General Release ("Release") includes, but is not limited to, any claim or entitlement to pay, benefits or damages arising under any federal law (including but not limited to . . . the Employee Retirement Income Security Act . . .); any claim arising under [any other law], or under Motorola's personnel policies. I understand by signing this Release I am not releasing any claims for benefits under the Motorola employee benefits plan. Nor am I waiving any other claims or rights which cannot be waived by law . . . .

At the time he signed this release Howell had been working for Motorola for approximately five years. Motorola terminated his employment in August 2001 as part of a more general reduction in force. Pursuant to Motorola's severance program, he received an uncondi-

tional standard severance payment. Motorola also offered the opportunity to receive additional severance pay for employees who were willing to sign this release. Howell signed the release on September 17, 2001, nearly a month after he received it. He acknowledged in the release that he had been advised to contact an attorney before signing it; that he was signing voluntarily; that he had been given at least 45 days in which to consider it; that he had a right to revoke within seven days of signing it; and that, in a sense, he was swapping any future claims he might have against Motorola for the additional severance benefits.

Motorola reads this release as a comprehensive promise not to bring any lawsuit based on ERISA for any claim that had already accrued at the time that Howell signed the release. In Motorola's view, the only ERISA claims not covered by the release are Howell's "non-waivable claims for . . . underlying pension benefit[s] and claims for benefits that had not yet accrued" when Howell signed the release. Howell gives much greater emphasis to the two exceptions contained in the last two sentences of the release quoted above. He insists that a lawsuit complaining about a breach of fiduciary duty under ERISA can still be a "claim for benefits," particularly after the Supreme Court's *LaRue* decision blurred the line between suits brought under ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (permitting recovery of benefits due under a plan), and those brought under section 502(a)(2), 29 U.S.C. § 1132(a)(2) (providing for suits asserting breach of fiduciary duty). See generally *LaRue*, 552 U.S. at 257-60 (Roberts, C.J., con-

curring). One thing is clear: unless Howell can show that one or the other exception set forth in the release applies to him, or that his agreement to the release was somehow not made knowingly and voluntarily, then the language barring claims that arise under ERISA disposes of the present case.

Looking first at the latter question, we start with the proposition that for a release to be valid, the party must sign it knowingly and voluntarily. See *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15 (1974) (applying this principle to waivers of Title VII rights). A court must examine the totality of the circumstances surrounding the signature, including such matters as:

> (1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendant's part.

*Pierce v. Atchison, Topeka and Santa Fe Ry. Co.*, 65 F.3d 562, 571 (7th Cir. 1995) (footnote omitted). Like other lists of factors, these are illustrative. The critical question is whether Howell presented enough evidence in response

to Motorola's motion for summary judgment somehow to create a genuine issue of fact on the questions of knowledge and voluntariness.

The district court thought that he had not, and we agree with that assessment. Howell suggests that a jury might find that his signature was unknowing because a person of his educational level and sophistication would not have signed away such valuable claims as this lawsuit represents. This is just an assumption, however; it is not evidence. Howell does not dispute the fact that he received the supplemental severance payment that Motorola gave to those who signed the release. We are given no reason to believe that a rational person could not have deemed the amount of that payment adequate compensation for the rights he was giving up. Howell offers no concrete information in his affidavit to support the existence or absence of the factors identified in *Pierce* or any other circumstances—*e.g.*, that he was under heavy medication, or that Motorola failed to disclose important information at the time he signed—that might undermine a finding of knowing and voluntary waiver.

The next question is whether this lawsuit falls into the exception recognized in the release for "claims for benefits under the Motorola employee benefits plan." Relying on *Harzewski v. Guidant Corp.*, 489 F.3d 799 (7th Cir. 2007), Howell argues that it does. He points to the following passage in *Harzewski*: "The benefit in a defined-contribution pension plan is, to repeat, just whatever is in the retirement account when the employee retires or

*whatever would have been there had the plan honored the employee's entitlement*, which includes an entitlement to prudent management." *Id.* at 804-05 (emphasis in original). *LaRue,* Howell continues, is consistent with this approach, since *LaRue* held that an individual employee has a claim for breach of fiduciary duty with respect to a plan as a whole, even if only one person's account was affected by the breach. *LaRue*, 552 U.S. at 256.

Motorola responds that Howell's reading of the release would render meaningless the provision waiving (among other things) his claims under ERISA. Normal principles of contract interpretation require us to give effect to each clause of the release. See, *e.g.*, *LaSalle Nat. Trust, N.A. v. ECM Motor Co.*, 76 F.3d 140, 144 (7th Cir. 1996). It is Motorola's position that the carve-out for "claims for benefits" under the Plan cannot be co-extensive with all ERISA claims without doing violence to the contract as a whole.

Since *LaRue* was decided, it has been unclear whether a claim for breach of fiduciary duty under section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), can be called a "claim for benefits." The majority opinion in *LaRue* recognized that some breaches of fiduciary duty might impair the value of plan assets in a participant's individual account, even if the plan takes the defined-contribution form. See 552 U.S. at 256. The Court did not, however, need to address the question whether these claims arise exclusively under section 502(a)(2), or if they overlap with traditional claims for benefits under section 502(a)(1)(B). Concurring, Chief Justice Roberts called at-

tention to this ambiguity, noting that section 502(a)(1)(B) "allows a plan participant or beneficiary 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *LaRue*, 552 U.S. at 257 (Roberts, C.J., concurring) (quoting ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)). He went on to point out that there is a significant difference between the two sections, as there are various safeguards, including the requirement to exhaust plan remedies and the possibility of conferring discretion on the plan administrator, that apply in section 502(a)(1)(B) cases but are not applicable under section 502(a)(2). *LaRue*, 552 U.S. at 258-59. He concluded by "highlight[ing] the fact that the Court's determination that the present claim may be brought under § 502(a)(2) is reached without considering whether the possible availability of relief under § 502(a)(1)(B) alters that conclusion." *Id.* at 259.

We do not need to resolve that question today, because our task is an easier one. Rather than parsing the statute itself, we must decide only what the parties to a particular contract (the release) meant. Approached as a contractual matter, the only reading that makes sense is one under which the reservation of claims for benefits applies only to any specific benefits that had already vested in Howell's 401(k) plan by the time that he signed the release—there is no reason to think that Motorola was trying to confiscate those assets. But under the release, Howell has waived the right to bring a lawsuit challenging the Plan as a whole, either in the sense described in *Massachusetts Mutual Life Insurance*

*Co. v. Russell,* 473 U.S. 134 (1985), or in the sense described in *LaRue.* In short, as a contractual matter, if the need were to arise (though we are given no reason to think that it will), Howell remains entitled to sue to recover the money that was in his retirement account at the time he signed the release, but he cannot now claim that his account would have been worth even more had the defendants not breached a fiduciary duty.

Howell also asserts that his lawsuit falls under the clause in the release that exempts claims that are non-waivable as a matter of law. He relies particularly on ERISA section 410(a), 29 U.S.C. § 1110(a), the anti-alienation provision, which states:

> Except as provided in sections 1105(b)(1) and 1105(d) of this title, any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy.

Howell argues that the part of the release that purports to cover all claims, past, present, and future, even those that arise from a breach of fiduciary duty, violates this part of the statute. Motorola responds that section 410(a) covers only agreements that would release fiduciaries from duties in the future. It does not bar, Motorola continues, settlement of claims arising from past alleged breaches of fiduciary duty.

Although we have not had occasion to consider this question before, the Eighth Circuit did in *Leavitt v. Northwestern Bell Telephone Co.*, 921 F.2d 160 (8th Cir. 1990). It

held there that a release is not the kind of "agreement or instrument" that section 410(a) addresses. *Id.* at 161. Instead, it wrote:

> Section 1110(a) prohibits agreements that diminish the statutory obligations of a fiduciary. A release, however, does not relieve a fiduciary of any responsibility, obligation, or duty imposed by ERISA; instead, it merely settles a dispute that the fiduciary did not fulfill its responsibility or duty on a given occasion.

*Id*. at 161-62. Our decision in *Pierce,* in the context of discussing the voluntariness of a waiver, also took note of the importance of the federal policy in favor of voluntary settlement of claims. 65 F.3d at 572.

We conclude that Howell has read too much into section 410(a), and that his interpretation would make it impossible, as a practical matter, to settle any ERISA case. All that the release he signed accomplished was to settle, in advance, any claims that he might have brought against Motorola arising out of his employment there or his participation in the Plan, with the exception of those benefits that were due to him under the Plan at the time he signed his release. As the Eighth Circuit held in *Leavitt* and as we intimated in *Pierce,* such a settlement of claims is permissible under the statute.

In summary, we conclude that the district court properly granted summary judgment in Motorola's favor on Howell's claims.

### III.  Lingis Class Appeal

### A.  The Fiduciary Status of the Defendants

The Lingis class, as we noted earlier, expressly excludes persons who signed a release, as well as certain others who might create intra-class conflicts. We are therefore free to move to the merits. The class is suing under section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), which permits a civil action to be brought "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title [ERISA section 409]." Section 409 of ERISA creates liability for a breach of fiduciary duty. See 29 U.S.C. § 1109. The Supreme Court's decision in *LaRue* puts to rest any concern about the ability of a participant in a defined-contribution plan to bring a lawsuit under section 502(a)(2). (Our companion decisions today in *Spano* and *Beesley* treat this subject in more detail. See *Spano* and *Beesley*, Nos. 09-3001 & 09-3018, slip op. at 6-13.) Three questions remain: (1) Which, if any, defendants are Plan fiduciaries as ERISA understands the term? (2) Did any fiduciary breach his, her, or its duties? And (3) did any such breach cause harm to the plaintiffs? *Brosted v. Unum Life Ins. Co. of America*, 421 F.3d 459, 465 (7th Cir. 2005). If a particular defendant is not a fiduciary, then nothing more need be said. Similarly, even if a particular defendant is a fiduciary, if it did not breach any fiduciary duty, then there is no need to reach the question whether its actions harmed the plaintiffs. Our discussion proceeds with those basic principles in mind, beginning with the question whether the various defendants named are Plan fiduciaries.

1. *Motorola, Inc.* The list of defendants involved in this litigation is long, but we can treat the defendants in groups. The first question is whether Motorola, Inc., itself is a Plan fiduciary. The district court thought that it was not. Recognizing that a company may be a plan fiduciary as a result of its selection of plan administrators, the district court noted that Motorola's Board, rather than its executive officers, made appointments to the Committee. It believed that this was enough to exclude Motorola from the case.

We are not inclined to draw such a sharp distinction between the Board, acting on behalf of Motorola, and Motorola itself. Accordingly, we think it best to consider Motorola's status in slightly more detail. Courts have been careful to respect the distinction between the capacity of fiduciary or plan administrator, on the one hand, and employer or plan author on the other. See, *e.g.*, *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) (drawing a distinction between the plan sponsor's role as fiduciary and its actions to adopt, modify, or terminate a plan, where it takes on a role analogous to settlor of a trust); *Varity Corp. v. Howe*, 516 U.S. 489, 498 (1996) (noting the difference between a plan sponsor acting as employer and a sponsor acting as plan administrator). If a company is exercising discretionary authority over a plan's management or administration, *Varity* indicates that the company is to that extent behaving as a fiduciary. 516 U.S. at 498. Under this court's decision in *Leigh v. Engle*, a company can be a plan fiduciary when there is evidence that it played a role in appointing the administrators of the plan (and thus had a duty to

choose appointees wisely and to monitor their activities). 727 F.2d 113, 134-35 (7th Cir. 1984). In addition, *Leigh* suggests that a company might also act as a fiduciary to the extent that it exercises *de facto* control over plan decisions through the plan administrators that it selects. See *id.* at 134-35 & n.33. Either of those activities—appointing administrators or exercising control through appointees—falls on the plan management or administration side of the line drawn in *Varity*.

Even if we assume that the Board and Motorola are the same, however, there is no evidence in this record that Motorola did anything more than appoint Committee members to administer the Plan. No evidence suggests that the company exercised *de facto* control over Plan decisions through those Committee members. Thus the only serious question is whether Motorola (technically, its Board) acted irresponsibly in its choice of people for the Committee or in its efforts to monitor those people. That question (Motorola's own alleged negligence in selecting fiduciaries) is closely related to the issue whether Motorola might be liable to the plaintiffs based on the doctrine of *respondeat superior*. The plaintiffs made this argument before the district court, and they continue to press it here.

The federal common law of agency supplies the governing principles in ERISA cases. See, *e.g.*, *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322-23 (1992). The doctrine of *respondeat superior* can be found within that body of law. See, *e.g., Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 754-65 (1998). The Fifth Circuit has held

that a company might be liable under section 502(a)(2), but "only when the principal actively and knowingly participated in the agent's breach." *Bannistor v. Ullman,* 287 F.3d 394, 408 (5th Cir. 2002) (discussing *American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assur. Soc. of the U.S.,* 841 F.2d 658, 665 (5th Cir. 1988)). The Sixth Circuit permits vicarious liability even without a showing that the principal played an active and knowing part in the breach. *Hamilton v. Carell,* 243 F.2d 992, 1002-03 (6th Cir. 2001). See generally Bradley P. Humphreys, Comment, *Assessing the Viability and Virtues of* Respondeat Superior *for Nonfiduciary Responsibility in ERISA Actions,* 75 U. CHI. L. REV. 1683 (2008).

This court has implicitly recognized *respondeat superior* liability in ERISA cases. In *Wolin v. Smith Barney Inc.,* we described a case as one in which a plaintiff had charged that a fiduciary, "and so by the principle of *respondeat superior* his employer as well," had violated the statute. 83 F.3d 847, 859 (7th Cir. 1996), abrogated on other grounds by *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 193-95 (1997). In *Wolin,* however, we did not need to decide how far this principle should reach. It is a knotty problem. On the one hand, ERISA is a comprehensive statute that spells out exactly who should be liable for what; engrafting extra common-law remedies on top of that scheme is something that should not be done lightly. On the other hand, we have *Darden* and many other decisions telling us that ERISA must be read against the backdrop of the common law of agency (as well as other parts of the common law).

In this case, the question of Motorola's derivative liability, like the question whether it is directly liable for negligent selection and monitoring of Committee members, must be resolved only if the evidence could support a finding of unsatisfactory performance on the part of one or more of the fiduciaries that we will discuss in the following section. The Restatement (Third) of Agency describes the principle of *respondeat superior* as follows: "An employer is subject to liability for torts committed by employees while acting within the scope of their employment." RESTATEMENT (THIRD) OF AGENCY § 2.04 (2006). Since we conclude below that none of the individual defendants (acting individually or through the Committee) is liable, we set the question of derivative liability aside for another day, when it matters to the outcome of a case. We will assume, for purposes of this opinion, that Motorola is a fiduciary based on the Board's role in appointing Plan administrators to the Committee.

2. *The Remaining Defendants*. The remaining defendants fall into three groups: (1) the Committee that acted as the Plan Administrator; (2) the officers of Motorola, some of whom were also directors; and (3) the outside directors of the company. The most interesting question is whether the Committee as a separate entity is a fiduciary that can be sued. The defendants argue that it is not, but our decision in *Line Construction Benefit Fund v. Allied Electrical Contractors, Inc.*, 591 F.3d 576, 579-80 (7th Cir. 2010), points in the other direction. There we ruled that a multiemployer plan was a fiduciary

that could sue and be sued under section 502(a)(3), 29 U.S.C. § 1132(a)(3). We see no reason to treat an entity like the Committee here differently, and so we assume for present purposes that it is also a fiduciary. (Whether the Committee has any meaningful existence for purposes of this lawsuit apart from the people who sit on it or Motorola itself is a separate question. Like the question of Motorola's derivative liability, it is one that we need not resolve unless there is evidence that one or more of the individual defendants breached a fiduciary duty.)

With the fiduciary status of Motorola and the Committee assumed for the sake of argument, we can turn to the individual defendants. The following table summarizes the defendants that have been named[1] and what the theory of liability is for each one, to the extent we are able to tell from the record:

---

[1] At one point, the list of names also included William Declerck, David Devonshire, Richard Does, Richard Engstrom, Donald Jones, and Garth Milne. Motorola's Rule 26.1 Disclosure Statement, however, lists only the individual defendants set forth in the table. The plaintiffs make no objection to that list in their reply brief. We therefore take it as unopposed that the additional people named in this note are no longer in the case.

| Name | Position | Theories of Breach |
|---|---|---|
| Christopher B. Galvin | CEO; Chairman of Board during class period | Imprudence; disclosure; monitoring |
| Carl F. Koenemann | CFO; Committee member | Imprudence; disclosure |
| Robert L. Growney | COO; Board member during class period | Imprudence; disclosure; monitoring |
| Gary L. Tooker | Former CEO and Chairman; Committee member; Board member during class period | Monitoring |
| Rick Dorazil | VP of Benefits | None shown |
| H. Laurance Fuller | Outside Director | Monitoring |

| Anne P. Jones | Outside Director | Monitoring |
|---|---|---|
| Judy C. Lewent | Outside Director | Monitoring |
| Walter E. Massey | Outside Director | Monitoring |
| Nicholas Negroponte | Outside Director | Monitoring |
| John E. Pepper, Jr. | Outside Director | Monitoring |
| Samuel C. Scott III | Outside Director | Monitoring |
| John A. White | Outside Director | Monitoring |

Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Of the people named in the table, only Koenemann and Tooker served as members of the Committee during the class period. Those two are certainly covered by the statutory definition.

Moreover, all of the inside and outside directors who sat on the Board and in that capacity selected members of the Committee are fiduciaries, at least to the extent that they had obligations related to selecting and monitoring members of the Committee. See *Leigh*, 727 F.2d at 134-35. That leaves just Dorazil. The summary judgment record leaves unanswered questions about how much of a connection he had to the administration of the Plan. But we can imagine many scenarios in which a company's Vice-President of Benefits would fall squarely within ERISA's definition of fiduciary. For the purposes of this case, we prefer to say that the definition of fiduciary in ERISA section 3(21)(A) seems broad enough to sweep in all of the defendants named by the class. Because of the conclusions that we reach below, we have no need to resolve the question of Dorazil's fiduciary status conclusively.

### B. Claims Preserved Against the Defendants

To succeed in their suit, the plaintiffs must show more than that the defendants were fiduciaries. They must also present evidence that the fiduciaries breached a duty and that the breach caused them harm. To determine whether the class has done this, we must first check to see whether the plaintiffs have preserved a claim against each defendant that we have identified above. Recall that the class believes that the Plan fiduciaries fell short in three respects: (1) imprudence, by selecting and keeping the Motorola Stock Fund as a Plan investment option; (2) failure to disclose material

information; and (3) failure to appoint competent people to the Committee and to monitor their activities adequately.

The person who receives the most attention in the plaintiffs' briefs is Koenemann, who served on the Committee during the entire class period and became its chair at the end of 2000. He worked on the Telsim deal from 1998 forward and knew of the problems that were brewing. He discussed his concerns with Galvin, Growney, and KPMG in September 2000. He was not, however, a member of the Board, and so the class can assert only the imprudence and disclosure theories against Koenemann. Growney's involvement seems more remote, though the plaintiffs allege that he too knew about the problems with Telsim. Galvin is in the same position as Growney, at least in terms of specific allegations: he knew about the Telsim problems, but his responsibility for the selection of funds or disclosure is unclear. Nevertheless, both Galvin and Growney were members of the Board during the class period, and so presumably the class is pursuing all three theories against these two defendants.

Tooker chaired the Committee from May 2, 2000, until the end of the calendar year, but so far as the evidence in the summary judgment record reveals, he was unaware of the Telsim fiasco as of the time he left the Committee. That means that Tooker cannot be liable on the class's prudence or disclosure theories. There is evidence in the record, however, that Tooker was a member of the Board until 2001, which means that he is one of the director defendants against whom the

plaintiffs assert their monitoring claim. Dorazil, the Vice President of Benefits, was neither a director of Motorola nor a member of the Committee. While he had some responsibilities related to the Plan, it is unclear whether he had any role in reviewing the Plan's portfolio. In addition, despite the plaintiffs' statements in their briefs, there is not a shred of evidence that would permit an inference that Dorazil knew about Motorola's problems with Telsim during the class period—all of the evidence points in the other direction. As a result, it appears that the class has not preserved any of its three theories as far as Dorazil is concerned. Finally, the remainder of the defendants had no knowledge of the problems with Telsim; the plaintiffs appear to have included them solely for purposes of the monitoring theory.

For the remainder of this opinion, we shall proceed theory-by-theory. For each theory we discuss below, we will indicate which of the individual defendants are involved, for ease of reference. First we must outline general ERISA principles that guide our discussion of the defendants' fiduciary responsibilities.

### C.  General ERISA Principles

1. *Scope of Fiduciary Duty*. ERISA spells out what it means by the term "fiduciary duties" in section 404(a), 29 U.S.C. § 1104(a). We set that part of the statute out for ease of reference:

   (a) Prudent man standard of care

   (1) Subject to [certain exceptions not relied upon here], a fiduciary shall discharge his duties with respect to

a plan solely in the interest of the participants and beneficiaries and—

> (A) for the exclusive purpose of:
>
>> (i) providing benefits to participants and their beneficiaries; and
>>
>> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

(2) In the case of an eligible individual account plan (as defined in section 1107(d)(3) of this title), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying em-

ployer real property or qualifying employer securities (as defined in section 1107(d)(4) and (5) of this title).

ERISA § 404(a), 29 U.S.C. § 1104(a). This is a prime example of the Supreme Court's observation in *Firestone Tire and Rubber Company v. Bruch,* 489 U.S. 101, 110 (1989), that "ERISA abounds with the language and terminology of trust law." The *Bruch* Court specifically noted that "ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, codify and make applicable to ERISA fiduciaries certain principles developed in the evolution of the law of trusts." *Id.* (internal quotation marks and citations omitted). See generally JOHN H. LANGBEIN, BRUCE A. WOLK, SUSAN J. STABILE, PENSION AND EMPLOYEE BENEFIT LAW 590-630 (5th ed. 2010). Self-dealing, conflicts of interest, or even divided loyalties are inconsistent with fiduciary responsibilities.

2. *Safe Harbor under Section 404(c).* The statute also delineates a "safe harbor" for plan fiduciaries; it relieves fiduciaries of potential claims for breach of duty for self-directed accounts in section 404(c):

> (c) Control over assets by participant or beneficiary
>
> (1)(A) In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary)—

(i) such participant or beneficiary shall not be deemed to be a fiduciary by reason of such exercise, and

(ii) no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control, except that this clause shall not apply in connection with such participant or beneficiary for any blackout period during which the ability of such participant or beneficiary to direct the investment of the assets in his or her account is suspended by a plan sponsor or fiduciary.

ERISA § 404(c), 29 U.S.C. § 1104(c). In our decision on rehearing in *Hecker v. Deere & Co.*, 569 F.3d 708, 710 (7th Cir. 2009) (*Hecker II*), we clarified that we had no need to decide there whether the 404(c) safe harbor could be used to defend against claims of imprudent fund selection for a plan. Under the facts before us, no such claim was plausible, *cf. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and so we reserved that issue for another day.

The question has returned in the present case. The purpose of section 404(c) is to relieve the fiduciary of responsibility for choices made by someone beyond its control; that is, the participant (or beneficiary—we mean to include both in this discussion). If an individual account is self-directed, then it would make no sense to blame the fiduciary for the participant's decision to invest 40% of her assets in Fund A and 60%

in Fund B, rather than splitting assets somehow among four different funds, emphasizing A rather than B, or taking any other decision. In short, the statute ensures that the fiduciary will not be held responsible for decisions over which it had no control. See *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (remarking that provisions of ERISA "allocate[ ] liability for plan-related misdeeds in reasonable proportion to respective actors' power to control and prevent the misdeeds"). The language used throughout section 404(c) thus creates a safe harbor only with respect to decisions that the participant can make. The choice of which investments will be presented in the menu that the plan sponsor adopts is not within the participant's power. It is instead a core decision relating to the administration of the plan and the benefits that will be offered to participants.

Thus, we agree with the position taken by the Secretary of Labor in her *amicus curiae* brief that the selection of plan investment options and the decision to continue offering a particular investment vehicle are acts to which fiduciary duties attach, and that the safe harbor is not available for such acts. The Fourth Circuit came to the same conclusion in *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3 (4th Cir. 2007). It is instead the fiduciary's responsibility, as the Secretary puts it, to screen investment alternatives and to ensure that imprudent options are not offered to plan participants. The regulations that the Secretary had put in place to implement the statute during the class period are consistent with this position. The regulation implementing section 404(c) says that the fiduciaries may not be held liable

for any loss or fiduciary breach "that is the direct and necessary result of that participant's or beneficiary's exercise of control." 29 C.F.R. § 2550.404c-1(d)(2)(i). In order to satisfy the requirement that the participant have meaningful control of their plan assets, the regulation requires the plan to provide sufficient information so that participants can make informed decisions, and it explains what must be done to satisfy that requirement. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B).

### D.  Particular Theories of Liability

With those principles in mind, we are now in a position to evaluate the three theories of liability that the Lingis class is pursuing against the Motorola defendants. As we explain below, we conclude that the safe harbor is not available for the imprudence claim, but that this theory fails on the merits. The safe harbor is available to the defendants, however, for the plaintiffs' disclosure and monitoring theories. Even if it were not, the plaintiffs have not brought forward enough evidence to prevail on their disclosure theories, nor does this record support their inadequate monitoring theory.

1. *Imprudence.* As we noted earlier, the imprudence theory turns on the plaintiffs' ability to show that defendants Galvin, Koenemann, or Growney breached a fiduciary duty. For all of the other defendants, either the record does not indicate that they had anything to do with choosing the investment menu that was offered under the Plan or there is no evidence that they had any knowledge of Motorola's problems with the Telsim transaction.

The plaintiffs' theory is that these individual defendants, along with Motorola and the Committee, violated their fiduciary duties by including the Motorola Stock Fund as one of the Plan's investment options. It is unclear whether they believe that the breach of duty arose at the very moment that the Motorola Stock Fund was designated for the Plan, or if they are arguing that the decision not to revise the Plan and withdraw this as an option was the violation. (The latter theory seems more likely.) Their evidence, however, is fatally thin (recalling, of course, that the only question before us is whether it is enough to require the denial of summary judgment). All they have is their expert's *ipse dixit* that Motorola stock was an imprudent option for a retirement plan, a few conclusory assertions that the Motorola Stock Fund should have been removed from the Plan at some point, and the assertion that in retrospect it seems that the 25% cap on the amount of Motorola stock that could be in any one person's account that existed until July 1, 2000, (and that was removed at the demand of Motorola's employees) should have remained in place. The plaintiffs add that there were many warning signs that the Telsim loans were not likely to be repaid and that the drop in the price of Motorola stock is proof that the Motorola Stock Fund did not belong in the Plan's portfolio.

This is not enough. A single plan participant directing his or her pension account does not have a duty to diversify assets. See ERISA §§ 404(a)(1)(C), (a)(2) and 407(d)(3), 29 U.S.C. §§ 1104(a)(1)(C), (a)(2) and 1107(d)(3) (describing plan fiduciary diversification duties); see

also *Steinman v. Hicks*, 352 F.3d 1101, 1103 (7th Cir. 2003) (explaining Congress's decision to exempt employee stock ownership plans from diversification require-ments). Even for normal employee stock ownership plans ("ESOPs"), courts apply a presumption of prudence where the fiduciary in charge of the plan is directed by the plan to invest in the company's stock. *Summers v. State Bank & Trust Co.*, 453 F.3d 404, 410 (7th Cir. 2006); *Moench v. Robertson*, 62 F.3d 553, 571-72 (3d Cir. 1995). The decision of the Plan fiduciaries in the present case to continue offering—as *one* option—the Motorola Stock Fund must be evaluated against that backdrop. And in any event, even if this were a benefit plan devoted ex-clusively to Motorola stock, "[m]ere stock fluctuations, even those that trend down significantly, are insufficient to establish the requisite imprudence . . . ." *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004). The value of Motorola stock did not collapse in a day, or even in a few days. Plan participants were entitled throughout the class period—with the very brief exception of the blackout period, during which the stock price did not fall much at all—to move their dollars away from the Motorola Stock Fund into a dif-ferent fund on a daily basis; anyone concerned by the downward trend that persisted for some time could have done so (and it is probable that many people did).

We have suggested before that the tension faced by the administrators of an ESOP between protecting against risk and establishing a portfolio dominated by company stock is "not acute if the participants in the ESOP have adequate sources of income or wealth that

are not correlated with the risk of the [company] stock . . . ." *Summers*, 453 F.3d at 410. The very existence of the three other investment options (until July 1, 2000) or eight other options (after that date), in the absence of any challenge to any of those other funds, offers assurance that the Plan was adequately diversified and no participant's retirement portfolio could be held hostage to Motorola's fortunes. Furthermore, the evidence does not portray a situation in which Motorola was facing imminent collapse. *Cf. Moench*, 62 F.3d at 572. The volatility that Motorola stock was experiencing was within the bounds described by the Plan documents. Throughout the period covered by this case, Motorola was a fundamentally sound company. Nothing should have tipped the Plan's fiduciaries off to the (dubious) proposition that Motorola's stock had become so risky or worthless that the Motorola Stock Fund itself had to be withdrawn from the Plan immediately. In short, the plaintiffs have not done enough to defeat the defendants' motion for summary judgment, insofar as it relates to the alleged imprudence of the Plan's inclusion of the Motorola Stock Fund as one of several investment vehicles.

2. *Failure To Disclose.* The plaintiffs' theory that Galvin, Koenemann, and Growney failed to disclose material information about problems with Telsim implicates both the basic fiduciary duty to provide sufficient information to the Plan participants and the section 404(c) safe harbor. The plaintiffs argue that the defendants' concealment of the extent of Motorola's problems before *Bloomberg News* broke the story on April 6, 2001, caused the Plan to fail to meet two require-

ments that the defendants must satisfy in order to take advantage of the section 404(c) safe harbor: first, it deprived participants of sufficient information to make informed decisions, because it did not provide an adequate description of the investment objectives and risk/return characteristics of the Motorola Stock Fund, see 29 C.F.R. § 2550.404c-1(b)(2)(i)(B); and second, it deprived them of the opportunity to exercise individual control of their accounts because the Plan fiduciaries concealed material, non-public facts related to the Motorola Stock Fund, see *id.* § 2550.404c-1(c)(2)(ii).

a. <u>Provision of sufficient information</u>. The governing regulations set forth nine criteria that must be satisfied in order to meet the obligation to provide sufficient information to plan participants. See *id.* § 2550.404c-1(b)(2)(i)(B)(1)(i)-(ix). The plaintiffs argue only that the Plan fiduciaries failed to comply with requirement (ii), which read (until December 20, 2010, and thus at the relevant time):

> [A participant or beneficiary will not be considered to have sufficient investment information unless the participant or beneficiary is provided by an identified plan fiduciary a] description of the investment alternatives available under the plan and, with respect to each designated investment alternative, a general description of the investment objectives and risk and return characteristics of each such alternative, including information relating to the type and diversification of assets comprising the portfolio of the designed investment alternative . . . .

*Id.* § 2550.404c-1(b)(2)(i)(B)(1)(ii). The question is thus whether there is a genuine issue about the sufficiency of the information that the Plan provided to its participants about the Motorola Stock Fund.

Motorola's benefits pamphlet, its Summary Plan Descriptions, its Annual Reports, its benefits statements, and an August 1, 2000, Prospectus ranked the different funds sponsored by the Plan by risk and described the investment strategies of each one. These documents classified the Motorola Stock Fund as the high-risk option. They disclosed that this fund was invested exclusively in Motorola common stock, and they noted that it was intended for long-term growth and was susceptible to substantial short-term fluctuations. The Prospectus disclosed the various risks of the Motorola Stock Fund, including market risk, nondiversification risk, and stock risks. It acknowledged that the Motorola Stock Fund had suffered a 25.5% loss in its worst quarter and that year-by-year returns varied from 9.3% to 142.2%. It is hard for us to imagine what else the Plan fiduciaries could have told the participants that would have provided better guidance. This information satisfied the requirement of "a general description of the investment objectives and risk" of the Motorola Stock Fund.

b. Control of assets. ERISA's regulations also require, as a condition for the safe harbor of section 404(c), that participants must exercise "independent control in fact," not just the illusion of control. 29 C.F.R. § 2550.404c-1(c)(1)(i). The necessary control will be lacking if the

plan fiduciary has "concealed material non-public facts regarding the investment from the participant or beneficiary, unless the disclosure of such information by the plan fiduciary to the participant or beneficiary would violate any provision of federal law or any provision of state law which is not preempted by the Act . . . ." *Id.* § 2550.404c-1(c)(2)(ii). The plaintiffs argue that the evidence will support a finding that such concealment took place here.

The district court noted that there was no dispute that the facts about the Telsim disaster were non-public. The court also observed that the only people capable of *concealing* these facts were those who knew about them. As we have already discussed, the only defendants who meet that description based on the summary judgment record are Galvin, Growney, and Koenemann. While the plaintiffs have not developed to any degree the argument that Galvin and Growney failed to disclose material information, we will consider all three defendants for the sake of thoroughness.

The parties dispute whether the information about Motorola's transaction with Telsim was material at all. We agree with the district court that the Telsim debacle's noticeable impact on Motorola's stock price resolves this question in favor of the plaintiffs. When Credit entered its deal with Telsim in 1999 and at the start of the class period in 2000, Motorola's stock was selling for approximately $30 per share. By the time the *Bloomberg News* story broke, the price had slid to about half that, and that news sent the stock price down ap-

proximately 20% in a single day. Even though the defendants have presented evidence that the decline in Motorola's stock was statistically insignificant, and although Motorola's price per share had recovered by the end of the class period, we think the plaintiffs have presented enough evidence to create a genuine issue about whether the Telsim information was material. The Telsim risk was a major one that predictably contributed to fluctuations in value; we can see how this information was material to the plaintiffs' interest and would have changed the investment strategy of Plan participants who had the option of shifting assets from the Motorola Stock Fund to other investments sponsored by the Plan.

That leaves the question whether Galvin, Growney, or Koenemann concealed the material, non-public facts in question from the Plan participants. The regulations governing section 404(c)'s safe harbor do not define what constitutes concealment of material information, and so the district court drew upon the more general disclosure duty embodied in ERISA. Under the statute, "material facts affecting the interests of plan participants or beneficiaries must be disclosed." *Kamler v. H/N Telecommunication Services, Inc.*, 305 F.3d 672, 681 (7th Cir. 2002) (internal quotation marks omitted). The district court's approach—defining the prohibition on concealment of material information contained in the regulations based on ERISA's general fiduciary disclosure obligation—is sound. While the district court is correct that this may well mean there will be no case where a defendant can both breach ERISA's fiduciary duty to disclose

information and also take advantage of section 404(c)'s safe harbor, we can think of no other principled way to conceptualize the disclosure obligation embodied in the regulations; nor, for that matter, do we see why the disclosure required of Plan fiduciaries under ERISA generally should be different than that required in order for fiduciaries to take advantage of section 404(c).

A violation of ERISA's disclosure requirement, which arises under the general fiduciary duties imposed by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires evidence of either an intentionally misleading statement, or a material omission where the fiduciary's silence can be construed as misleading. See *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009) (*Hecker I*) (citing *Varity Corp.*, 516 U.S. at 505; *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 992 (7th Cir. 1993)). The plaintiffs do not point to any intentionally misleading statement issued by Galvin, Koenemann, or Growney. To the extent that they argue that the defendants negligently misrepresented information about Telsim in their SEC filings, that negligence would not be enough to show a violation of ERISA's disclosure duty. See *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 642 (7th Cir. 2004) ("[W]hile there is a duty to provide accurate information under ERISA, negligence in fulfilling that duty is not actionable."). Contrary to the plaintiffs' position (and to the position of other circuits, *e.g.*, *Pfahler v. National Latex Prods. Co.*, 517 F.3d 816, 830 (6th Cir. 2007); *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1183 (9th Cir. 2004)), this court has required some deliberate misstatement before it finds a violation of the ERISA duty to disclose material infor-

mation, *e.g.*, *Brosted*, 421 F.3d at 466; *Beach v. Commonwealth Edison Co.*, 382 F.3d 656, 658-59 (7th Cir. 2004). "But this does not mean that the duty to convey complete and accurate information is toothless. . . . [A]lthough negligent misrepresentations are not themselves actionable, the failure to take reasonable steps to head off such misrepresentations can be actionable." *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 470-71 (7th Cir. 2010). A plaintiff may introduce evidence that a fiduciary breached the duty to disclose by committing some material omission that is misleading and actionable under the statute.

But the plaintiffs have not introduced sufficient evidence of that sort of omission by Galvin, Koenemann, or Growney. We have required more than this record reveals. For example, we have found a breach of fiduciary duty stemming from a failure to disclose an integral part of the plan. See *Anweiler*, 3 F.3d at 991-92 (finding that defendants breached their fiduciary duties by failing to disclose that a reimbursement agreement related to an employee's life insurance was revocable at will and that the employee was not required to sign it). Similarly, we found a breach when the fiduciary withheld information about the actual value of plan assets when employees are required to make a choice about a payout under the plan. See *Solis v. Current Development Corp.*, 557 F.3d 772, 777-78 (7th Cir. 2009). Whatever omissions occurred here are not comparable. As the district court noted, there is no support for the view that Plan fiduciaries were required to provide all information about Motorola's business decisions in real time to Plan participants; and the fact that the

Telsim deal was a *bad* business decision is not enough to make the omission of information a violation of ERISA. We can think of at least one problem that such a rule might create: insider trading. The following portion of our discussion in *Rogers v. Baxter International, Inc.* is relevant here:

> Perhaps the defendants in this litigation did have inside information, but could they use it for plaintiffs' benefit? Plaintiffs' position seems to be that [plan fiduciaries] are obligated to adopt a policy under which employees invest in a stock during periods of good news for the issuer but not during periods of bad news. The implication is that someone else (which is to say, investors at large) must bear the loss when bad news is announced, because the [plan participants] will have bailed out. Corporate insiders cannot trade on their own behalf using private information, good or bad.

521 F.3d 702, 706 (7th Cir. 2008). It is enough to say for present purposes that the class has presented no good argument or evidence that Galvin, Koenemann, or Growney misled Plan participants and violated ERISA by failing to inform them about the problems with Motorola's deal with Telsim in a more timely fashion.

Our conclusion that the defendants did not violate the general disclosure duty embodied in ERISA means that they also complied with the section 404(c) regulations concerning concealment of material, non-public facts about the Motorola Stock Fund. Accordingly, we agree with the district court that the defendants are entitled

to take advantage of the section 404(c) safe harbor and thus that they are entitled to summary judgment on the plaintiffs' disclosure theories.

3. *Failure To Monitor*. Our conclusion that the defendants satisfied the Department of Labor's regulations for plans administered under ERISA section 404(c) and thus are entitled to take advantage of section 404(c)'s safe harbor applies with equal force to the plaintiffs' monitoring theory. The plaintiffs allege that Motorola Board members violated fiduciary duties imposed by ERISA by failing to appoint competent Committee members to run the Plan and by neglecting their duty to monitor Committee members and provide them with needed information. The plaintiffs' argument is specific: they say that "appointing fiduciaries must continually monitor their appointees." They press their theory against every individual defendant who served as either an inside director or an outside director of Motorola. We agree with the district court that the defendants are entitled to take advantage of section 404(c)'s safe harbor on this claim. Even if there were no statutory safe harbor, however, it is worth noting that the plaintiffs' argument that summary judgment was not warranted on this point borders on frivolous. There is no doubt that those who appoint plan administrations have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees. *Leigh*, 727 F.2d at 134-35. The Department of Labor has elaborated on this duty:

> At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the

appointing fiduciary in such manner as may be rea-
sonably expected to ensure that their performance
has been in compliance with the terms of the plan
and statutory standards, and satisfies the needs of the
plan. No single procedure will be appropriate in
all cases; the procedure adopted may vary in accor-
dance with the nature of the plan and other facts and
circumstances relevant to the choice of procedure.

29 C.F.R. § 2509.75-8 at FR-17 (Department of Labor
questions and answers). The duty exists so that a plan
administrator or sponsor cannot escape liability by
passing the buck to another person and then turning a
blind eye. There is no evidence that anything like that
occurred here. Plan procedures required annual renewal
of appointments to the Committee, periodic reports by
the Committee to the Board, and outside auditing of
the Plan by KPMG. There is no evidence about how
many reports were produced for the Board or what
resulted from annual reviews of the Committee by the
directors because the plaintiffs have not put anything on
the subject into the record. The plaintiffs essentially ask
us to recognize a duty to monitor that would require
every appointing Board member to review all business
decisions of Plan administrators. As the district court
rightly pointed out, that standard would defeat the pur-
pose of having trustees appointed to run a benefits plan
in the first place. Even if the defendants were not
entitled to take advantage of the section 404(c) defense
to the plaintiffs' monitoring claim, the plaintiffs read the
duty outlined in *Leigh* much too broadly, and their claim
would fail on the merits. The district court correctly

granted summary judgment to the defendants on this theory.

## IV

In conclusion, we wish to emphasize what we are, and are not, holding in these cases. There are indeed some fiduciary duties that arise in connection with a company's choice of investment vehicles for a defined-contribution plan. The present cases, however, reach us after all parties have had a chance to develop the record for purposes of summary judgment. It was the plaintiffs' burden in each case to show that genuine issues of material fact remain that warrant a trial. We conclude, for the reasons we have given here, that neither Howell (because of the release he signed) nor the Lingis class have succeeded in doing so. We therefore AFFIRM the judgments of the district court.